Good morning. If it may please the Court, Alex Pesner for Appellants, the State of California, by and through the Department of Transportation, Tokes Amashokan, and Dina El-Tawanzi. I would like to begin by acknowledging that the Supreme Court's September 27, 2021, order misapplied Ninth Circuit precedent and constituted abuse of discretion. For a preliminary injunction to issue, plaintiffs had to make a clear showing of likelihood of success in the merits or, under the sliding scale approach, raise serious questions demonstrating a realistic possibility of success. They failed to do so. Could I interrupt a second and ask, what order of Judge Chen should we be considering? Your Honor, we're here about the September 27, 2021, order. That is technically the order that's still in effect with respect to the removal of the encampment. Well, that order is no longer in effect because it's been superseded by a new order that was just issued. In fact, the September 27 expired on March 27. So that's one of the issues. We asked the parties to address mootness. We've gotten those. But even if we rule on the September 27 order because we find an exception to mootness, what effect would that have here given the new order that came out? Your Honor, the issues here are the exact same issues that I think were dealt with by the Ninth Circuit in the Shell offshore. We've got significant infirmities. In fact, to date, Caltrans has not had an opportunity to have possession, custody, and control of its property for 310 days. No, I understand. But, I mean, what we're trying to figure out is just procedurally how do we sort this out? We have a district court who issues a six-month order. Caltrans never asked for expedited review of that. Did you ask for a stay of the injunction pending appeal? The appellants did not. But the concerns we've raised, I think many of the concerns are still valid. And I think one of the reasons this case is not moot, Your Honor, is because there have been at least three preliminary at least three temporary restraining orders, a multitude of motions for a preliminary injunction. There is nothing that says that on April 29th, let's say there's a change in the status of the pandemic, plaintiffs won't seek a further temporary restraining order or further preliminary injunction. Although they did, and Judge Chen gave them one month, not four, that was requested. Shouldn't that kind of suggest to us that he's setting a firm deadline, that he's not going to extend again because he did not give them what they asked for after considering apparently a substantial amount of new evidence? Judge Bolton, I think the concerns the State has raised, frankly, transcend the most recent order. I think there's clearly the same issues that were raised in the Shalof Shore. Part of the problem with the Court's order is the length. So if there's a reasonable expectation that there will be either a future request by plaintiffs or the plaintiff in this case, where do we go, Berkeley? That's their mission, is to advocate and protect for individuals residing on Caltrans's right-of-way in Oakland, Berkeley, and Emeryville. So the difficult part with this order is its lengths. Let's say the Court granted plaintiffs' current request for a preliminary injunction, and it was only four months. Caltrans could not get that So what is Caltrans actually asking us to do? Are you asking us to vacate the September 27th injunction? Because I think that's all we have authority to do right now. Or are you asking us to reverse it in order that no injunction could issue based on at least the evidence that was available in the September 27th order? The latter, Your Honor. I think Caltrans's concern is there were significant infirmities with the Court's September 27th, 2021 order, which essentially is, to some extent, the basis of the Court's most recent order. By the time, by April 30th, Caltrans will not have had possession of custody and control of its property. So can I get to your argument on the likelihood of success on the merits? You argue strongly that there's no program here. It seems to me that there is a program. The question is, what is the contours of the program? Would you agree with that? I would disagree with that characterization, Your Honor. I think it goes back to inputs and outputs. Well, inputs and outputs have sort of been rejected recently by the Ninth Circuit, and what we have said is anything that a government does is a program for purposes of the ADA. So the question seems to be, what is Caltrans? And this is what I was looking for in the record, and nobody, neither party really grappled with this question about what is the program. Because it seems to me that it's very different if the program is Caltrans is agreeing to relocate these individuals versus what I think the program is, which is, you know, clearing their property and providing liaison services. Can you flesh out what these liaison services are? So, Your Honor, Caltrans' program, in fact, there's really no program for removing encampments. Caltrans undertakes— You're being given $51 million. I'm not sure how that isn't a program. I mean, certainly the program, at a minimum, involves cleanup of the camps once individuals are removed. And Caltrans also has its statement that on properties like this, everyone has to be removed within 72 hours. So isn't that a program, that these individuals are removed within 72 hours if they're on the property in this way? Your Honor, I think there's a distinction between—so to address the funds. The funds, as I understand the record to be, are there to remove encampments. They're for clean They're not there— Right, but that would be a program, right? Your Honor, I think it goes back to this idea of inputs and outputs, and I understand the argument— But somebody's benefiting from that. It's a program—at a minimum, it's a program for purposes of the drivers keeping—I mean, if you're given $50 million to clean streets, then that is benefiting the public in the sense that they're entitled to clean streets that they can walk on safely. So I'm not sure that conceding that there's a program of some sort here is detrimental to your case. You seem to think that if you concede that, that you lose. It seems to me the better—what we really need to grapple with is what's the contours of the program here, because the District Court extended the program way beyond what Caltrans ever intended it to be. Well, Your Honor, that was part of the State's argument in the court below, is that this is a removal of encampments. That's essentially what the State is doing. In fact, the process for the way the State does it is subject to a State court settlement in the Sanchez case. So the notice, the amount of time, and the specific process is dedicated to that. During the pandemic— Does that settlement cover this case? That's the State's position, is that was literally what the purpose of the settlement was. And what does the Sanchez settlement provide? Among other things, it provides the amount of notice, the process for the State must go through before conducting a removal. So, for example, one of the concerns that the plaintiffs rate in this, the underlying State case, was that when Caltrans crews came in, they did not provide enough notice for the individuals living there to collect their property and move it. So the settlement provides that before Caltrans actually moves forward on the day of removal, those individuals are given at least 30 minutes to remove their possessions from the property before Caltrans actually goes forward with the actual removal. The Sanchez settlement also provides the process for which Caltrans collects property, which property is to be collected, how it's to be stored. And what does the settlement provide as to the length of time or notice that has to be given before clearing an encampment? There's a minimum of 48 hours notice. You're being more generous by saying we're going to give 72. You have generally in your policies is to provide 72 hours, right? Correct. So the policy generally provides 72 hours. Under the settlement agreement, Caltrans only is required to provide 48 hours notice within the pilot project in the cities of Oakland, Berkeley, and Emeryville. Can I ask a question about, there's this overview document where Caltrans talks about, if you want to call it a program, whatever it is, but it says, well, Caltrans is not the state transportation department is a committed partner in working with local and state experts on homelessness, in developing solutions for people taking shelter on Caltrans property. What do you define that to mean by being a committed partner in working with state and local experts in developing solutions? Governor, I think going a little bit back for the purpose of the interim guidelines, as they say, their interim guidelines, they were created during a pandemic in an effort to... I don't really care how they're created. I want to know what this means. What is Caltrans? Caltrans is holding itself... Part of the problem here is that Caltrans is holding itself out to the public to say, we are a committed partner in developing solutions. What does that mean? Because it seems a little bit unfair for Caltrans to sort of be putting... If Caltrans had said, hey, this is a real problem. We are going to take your hand. We're going to make sure you move from this place. We're not going to kick you out until you have a viable alternative. Wouldn't that create a program that Caltrans would perhaps then have to... You wouldn't be able to just remove them within 72 hours. Your Honor, I think we have to go back to Zimmerman and frankly, the whole progeny of those cases because simply by creating an internal document, Caltrans doesn't create a duty. In fact, if Caltrans today said, we're going to withdraw the interim guidelines, the pandemic is over, the entirety of this document is withdrawn. We go back to Caltrans' original policy of removing encampments with 72-hour notice without classifying the encampments based on the level. There would be essentially no legal requirement for Caltrans. What if they had funds? What if the legislature or the city gave them $50 million that was specifically designed for building new temporary housing, providing buses to take them from unsafe places and put them in this temporary housing in safe places? Would that be a program? Your Honor, the state California Department of Transportation does not have authority to use its funding and it's fairly circumscribed by state law in what it can do. I'm just asking. I mean, again, you seem to be getting defensive at the questions, but I think the right answer is that's not this case. This case is you are given $50 million and it's for clearing and cleaning up. It's not for transporting and relocating. Your Honor, you're absolutely correct. That is not what the — if you assume that removal of encampments is a program, the intent of the program has nothing to do with any ADA disability issues. It's not intended to provide any services to anybody. In fact, if you're looking — Well, it does seem to be providing services, liaison services. And that's why I keep coming back to what is liaison services? Is that you give them a list and say, hey, here's 10 shelters that are close by. Good luck. Or what does liaison services mean? And Your Honor, I'm almost out of time. That's okay. You can ask the question. The way — and I'm not sure this is in the record, but the way the liaison services worked is because Caltrans doesn't have the ability to require any other public entity to do anything, liaison services means that Caltrans teams go to a continuum of cares. They go to local public entities like the county and the cities. Like in this case, for example, they went to the city of Berkeley and they asked the city of Berkeley, do you have outreach teams? Do you have available teams that could provide those services to those individuals in those encampments so they could actually have a place to be? Caltrans didn't have authority to fund any of this shelter space, didn't have authority to fund any housing, but the intent of the policy is to have Caltrans staff actually work with other public agencies, other continuums of care. Okay. Yeah, we'll give you some time for rebuttal. Thank you, Your Honor. Ms. Johns? Thank you. Good morning, and may it please the court. My name is Emily Rose Johns, and I represent the plaintiff, Apalis, in this matter. The district court did not abuse its discretion when it granted a preliminary injunction of six months allowing plaintiffs to fully and equally benefit from Caltrans' program of engaging persons in encampments on its property, connecting them to continuums of care partners, creating a relocation plan, and finding suitable shelter or housing for them or alternative state land to occupy. Counsel, counsel, counsel, the very rendition that you just went through is deeply troubling to me because that is so far removed from whatever program Caltrans is doing. What in the world gives the district court the right to require Caltrans to stay its removal process during all of these other contingency explanations? There are two reasons that the district court did not abuse its discretion in doing so. The first is that Caltrans' program is not simply the removal of encampments. In the record on 7 ER 1629, there is a policy. The policy spans 1628 through 1631. There is also guidance that spans 7 ER 1602 through 1621. But on the page I cited, 1629, it says that the districts shall coordinate with continuums of care or other lead local entities on homelessness and other relevant local partners focusing on relocation solutions first before requesting approval. How can you possibly have an aid based on the policy or program that you just stated? Tell me what the ADA violation is. How do you violate the ADA in a policy to coordinate with other agencies? Where's the ADA violation in coordinating with other agencies? Certainly, the ADA violation is that if a policy or program or activity or service of an entity unduly burdens persons with disabilities, either the way that it is carried out. The policy that you just read us was at a very, very high level of generality. It was to coordinate with other agencies. So tell me how we have now that we have created undue burdens by coordinating with other agencies. I understand that the people that you represent have some very, very serious disabilities, and those disabilities need to be accommodated in particular ways. But how is it violated by Caltrans' program of coordinating with other agencies? In other words, you've stated the program at such a high level of abstraction that I don't know. I don't see where the ADA comes in at all. Certainly. Caltrans in this matter fulfilled its obligations to this or purported to fill its obligations to this program by working with the city of Berkeley to offer one alternative location for individuals to go. That was the Horizon Shelter, also referred to in the record as the Grayson Shelter, because it is on Grayson Street. That shelter was a congregate shelter that, as your honor identified, plaintiffs with the severe mental health disabilities that are in the record and that they've testified to, that Dr. Curiali testified to, those individuals could not access that shelter. Okay, but counsel, you're putting the cart before the horse, because you want an order to say, until there's actual alternative shelter that meets our standards, then Caltrans can't remove these individuals. That's not in any way what they committed to do. I apologize for interrupting you. Go ahead. That is not what plaintiffs sought. Plaintiffs sought additional time to be connected to an alternative housing location, if possible. Now, everybody understands. Caltrans' own program understands. Plaintiffs understand that it is not a guarantee that alternative housing locations will be identified. How did... There's a 72-hour time limit. There's a 48-hour time limit under the injunction. You've been given six, now seven months. How does that not just fundamentally destroy whatever program is here? I don't see the connection between these two things. Your honor is identifying two separate pieces of Caltrans activities. The first piece of Caltrans activity that we sought a preliminary injunction regarding was the time to coordinate possible relocation for plaintiffs. There is also an enforcement piece that Caltrans will be able to engage in on April 30th. As your honors noted, when my opposing counsel was speaking, the order on September 27th, was expired on its own terms on March 23rd, 2022. Now, as of April 30th, there will be no further injunction. The court has been very clear about that. And Caltrans will then be able to start its enforcement measures by noticing the removal of the encampment. And they can give as much time or as little time, up to 48 hours, as they would like. But this is crazy. You have a district court that stepped in. Caltrans wanted to remove these individuals. And a district court stepped in and gave them seven months before they could. So you're now saying that the 48-hour clock or the 72-hour clock hasn't even started a run because you delayed the start of the game. The problem I have here is that I don't see any analysis by the district court on likelihood of success on the merits. In fact, the district court sort of says, well, I'm not even sure there's a program here, but it doesn't matter. How are we supposed to deal with this? The Ninth Circuit has never said that all you have to do is file a complaint, and then we're going to look at the balance of harms. Why is this an ADA violation? Respectfully, Your Honor, plaintiffs filed much more than simply a complaint. There was an extensive record. But the district court didn't grapple with that in any way, shape, or form. Point me to where the district court grappled with this and said there's an ADA violation, that it defined the program and said how the program was being violated. So the district court in the September 27, 2021 transcript, the court will find the district court grappling with that, making that analysis. But its order doesn't say anything. Its order assumes there might not even be a program here. How can you enter an injunction when you don't even find that there's a likelihood of success on the merits or even a serious question that's analyzed in any substantive way? At a minimum, don't we have to send this back for the district court to do that analysis? Well, the court did find serious questions. It also found a plausible question. Why did the district court say that there was a plausible question? You agree that's not the standard, right? A plausible question is not a legal standard, and I don't believe the court was indicating that it was finding a legal standard. The court said very clearly that it found serious questions going to the merits of the on September 27, or excuse me, September 23, 2021, when we had the preliminary injunction hearing, the second fairly extensive preliminary injunction hearing, the first being, I believe, on September 3, and that transcript is in the record. But September 23, the Ninth Circuit issued its order in L.A. Alliance, and you'll see in the transcript that the court actually took a break to read that particular case because at the insistence of Caltrans. What I understood the court to be doing when it said we find serious questions going to the merits related to plaintiff's ADA claim, we find that based on the record that there's a program. But even if there is not— What is the program? What is the program? Counsel, I have the same question. You've defined the program. You defined the program for us, and you defined it at such a high level of abstraction that it's hard to find out how anybody could ever violate anything in that program. If it's to coordinate with agencies, that suggests that if there's an ADA violation, that it occurs in the way that Caltrans decides to accommodate its discussions with other agencies, which has nothing to do with your clients. Now, you need to give me a program that affects your clients that Caltrans is actually trying to effectuate. But as far as I can tell, the main purpose for Caltrans is to keep people moving safely on California's highways, not to accommodate those who, through unfortunate circumstances, are camped feet off of the roads. Respectfully, Your Honor, Caltrans has an obligation and many programs to deal with encroachments on its property. It has the interim guidance on homeless encampments and the policy that I cited at the beginning of my testimony. Now, tell me where the ADA violation is in those programs. The ADA violation is that, in this instance, that Caltrans did not provide a sufficient amount of time or sufficient amount of time to connect individuals with the services that they are, that Caltrans program contemplates. Is that a program that Caltrans administers, connecting them with facilities that they  Yes, it is a program that Caltrans administers. They shall do this coordination. They shall create a relocation plan. But it doesn't seem to guarantee any particular kind of result. If you've got folks who've got some very serious disabilities who are not willing to go to the shelters that they were offered, they're demanding a different kind of shelter, does Caltrans have an obligation to provide them with the kind of shelter that they're asking for? And it's otherwise an ADA violation? Your Honor, Caltrans has an obligation to not unduly, not implement a program that unduly burdens persons with mental health disabilities. It is not, plaintiffs and the court did not find that plaintiffs were unwilling to go to the shelter. And indeed, one person, Terry Lee Walker, did attempt to go to the shelter that was offered and they turned him away. And he has included that in his declaration. And I can give the court the exact citation for that. But I do want to address that this is not, we understand, plaintiffs understand, the court understands, there's no guarantee. But you keep saying that, but that's what you're asking for. They gave them options. Those options apparently weren't suitable. But that's the end of it. That's all Caltrans agreed to do, if anything, was to coordinate with available options. I mean, I just don't understand how you get from, you know, we're going to coordinate to you can't do anything for seven months while we look for alternative options. How long does it take to figure out alternative options? You go out, you spend 72 hours, you figure out what the alternative options are. You say, here's one, two, three, four, and five. Plaintiffs say, I can't do one. I can't do two. I can't do three. I can't do four. I can't do five. That's it. You don't get six months to go look for a sixth option. Your Honor, there were not five options in this case. There was one option and it was inaccessible. And if I may get behind that, that's fine. But are you suggesting, hold on, counsel. Are you suggesting there were other options that Caltrans was hiding from the plaintiffs and therefore they were giving them to non-disabled individuals, but to the disabled individuals they were keeping that list behind because they didn't want to accommodate them? That would be discrimination. No, certainly. But that's not what plaintiffs allege. And that is not the only way that the program activity or service would unduly burden plaintiffs with disabilities. The way that this program unduly burdened plaintiffs with disabilities is that people with disabilities require some additional time to be connected to programs if they're available. Explain to me how you get from 72 hours to seven months. I'm with you if it's a day or two because we need to find, there's some complications to this individual's disability. We've got to look into, it's harder for them to communicate. I get that. What I don't understand is 72 hours, which is the program definition, to seven months. This seems to be a borderline lawless order by the district court that doesn't seem to be supported by any finding of a violation of the law. Your Honor, the policies that we point to that create the program, I want to be very clear, these are not the policies, these are different policies than the policy that says that when Caltrans chooses to remove an encampment, it must give 72 hours notice or 14 hours notice. So what is the length of time for coordination? What is the length of time, the proper length of time for coordination in your view? You've asked for 10 months. What is the proper time that they have to coordinate? I believe if the court looks at the declaration of Darren Rafferty in the record, and I apologize, I do not remember the citation to the record, you will see that Caltrans, when it has implemented this program before, has done so over the course of months. Months is not unreasonable or unusual. The interim guidance itself contemplates leaving encampments on Caltrans property until such a time as they change their policy. Those are level 3 and level 4 encampments. But this is a priority, is it? We're dealing with a priority level 1 or a level 2 encampment here? I do not believe Caltrans created the record, and Your Honor, I apologize, I see my time is up, but may I finish answering your question? Yes, absolutely. I do not believe that Caltrans created a record about whether this was a level 1 or level 2 encampment, although it did cite safety concerns, it cited environmental concerns, and the court took that into consideration when it balanced the hardships and found that they tipped sharply in plaintiff's favor in this matter and found it appropriate to grant the preliminary injunction. Any order by this court would be an advisory opinion based on a mooted preliminary injunction, and the court should... Ms. Johns, that was my question. Can you give me in 30 or 45 seconds your best argument for why we should simply say, this is moot? Yes, Your Honor. The court on March 23rd, 2022, this injunction expired. There is an extensive record, as Your Honor noted, that is not before this court. The briefing on this is not before the court, where plaintiffs asked for some additional time. The court did ultimately give a month, finding that certain hardships continued, such as being disconnected from services, and any opinion that this court rendered on, as Caltrans said, the September 27th, 2021 order, any order issued by this court would simply be an advisory opinion as to that preliminary injunction. We said that that preliminary injunction never should have been entered. How does that affect your current preliminary injunction? Doesn't it have precedent for saying, well, I guess that one shouldn't have been entered either? Respectfully, Your Honor, I don't think that it would be ripe for any consideration. The March 23rd to April 30th order would not be ripe for any consideration by this court until the full record came before this court. And if the court issued an order on this case before April 30th, I think there would be additional briefing that would have to occur before the April 30th order could be, or excuse me, the order expiring April 30th could be considered. Why would you need additional briefing? Because there is additional, a voluminous record of plaintiffs, a new motion for preliminary injunction, defendants, opposition. Are the plaintiffs that are currently in the suit the same ones who are in the suit as of September, as of the September 27th order? Yes, it's not the, there are fewer plaintiffs because some people like Mariah Jackson were housed, were actually housed because she was allotted some additional time and not, and her connection with her service provider was not disrupted. Are any of your current plaintiffs, were any of your current plaintiffs not plaintiffs as of September 27th? No. Okay. The six plaintiffs that remain on Caltrans land currently were of the 11 plaintiffs. And they have remained, and they've remained on the Caltrans land for the last six months continuously? Your Honor, I do not know that for certain. I believe that the plaintiffs who are there were, the majority of them, if not all of them were on Caltrans land, either that particular parcel or there is one plaintiff that is there who moved to a different Caltrans parcel and then moved back. Okay. Are there, do you know whether there are, does the record show whether there are additional people living on that parcel that were not there in September? The current record does not have the most updated information. There is, I don't believe that the additional status reports were provided to the court in any supplemental or further excerpt of record. That would be certainly part of an additional record if there was additional briefings. I'm asking if you know. I do know that there are fewer people than there were in September. I believe the current number is something like 10 or 11, so six. Okay. But some of those, you only have six plaintiffs. Does that suggest then that we have other people who have joined that group in the interim? There are other people who remained there who the preliminary injunction, excuse me, on the land when the preliminary injunction was issued, who remained there, but fewer than there were originally. So this is, people are moving into, okay. So I still don't think I quite got an answer to my question. Are there people now living on this parcel with these plaintiffs who were not part of the original suit? They were, there are people who are living on the land who are not in the original complaint, who are not plaintiffs, excuse me, in the original complaint. There are, as far as I know, no new individuals living on the land. And I apologize if my memory is not correct, but I believe there are no new individuals living on the land. There were two people who between the moving paper, plaintiff's moving papers, and the court's order had moved to the land. And those people have been discussed in the supplemental excerpts of record that I believe the defendants provided with their reply to the, or their reply brief to the court. Thank you, counsel. Thank you, counsel. We'll give three minutes for rebuttal. Contrary to what plaintiffs argued, this, this injunction will not be moot or subject to mootness exception. This is exactly the concerns that were raised by the Shell Oil Court. As that court noted, orders of such inherently limited duration will almost always evade full review. This is precisely what we have here. Caltrans essentially has been ordered not to remove an encampment on its property. There is no allegation by plaintiffs in this case that they have a right to possess or to live there indefinitely. There's no nexus between the relief request and the complaint. Counsel, was this a level one or a level two encampment? There's two separate encampments. So the Ashby Shell Mound encampment was a level one. The Ashby West, when it was determined... Those are both covered by the injunction? Those were both covered by the injunction. So originally there were essentially three encampments. The court permitted Caltrans to remove one of the encampments. That was a level one. That was what the court would refer to as Ashby East. Okay. And then, so that was allowed to be removed. The other two are level two then, and that's why they were not allowed? The Shell Mound Street was a level one. The Ashby West, which is between Furnitge Road and Interstate 80 West, that is not in the record, but that would have been, if Caltrans posted a level two. And so those are both subject to the, not only the September 27th injunction, but the new extension? Correct, Your Honor. Okay. What about this idea that the 72 hours is a notice to vacate, but that historically Caltrans has given several months to coordinate before that 72 hour notice is given? Is that accurate? So before the interim guideline, before the pandemic, Caltrans actually had an actual schedule in these three cities where it would remove encampments. In fact, part of the requirement in the Kimberly-Sanchez case is that Caltrans must, a month in advance, post its removal schedule so that individuals in those encampments know when Caltrans will conduct the removal. So prior to the pandemic, Caltrans did not generally require its crews to liaison, for lack of better words, with other public entities. It does currently, and that's one of the things that happened here. And if you look at, I don't, of the ER site, the declaration of Cheryl Chambers, she goes through the process, as well as the Mr. Dafferty declaration. He's a, I believe he's one of the employees of the city of Berkeley, the deputy city manager. He goes through the process, the outreach process that the city actually conducted in response to Caltrans's request. So how much time is reasonable then before you give the 72-hour notice? According to whatever program may exist, what is the current policy for how long is appropriate? So for level one or level two, Caltrans can actually conduct a removal because those are deemed essentially a threat to... But how much time would you allocate to the liaison or the coordination? Because that seems to be expected to happen, perhaps, before the 72-hour notice is given. I think it depends widely on the circumstances. So if you have an encampment that, let's say, it actually is an active roadway, Caltrans crews can in fact, under its policy, remove that encampment without notice. Because that constitutes an immediate threat to both the people experiencing homelessness and people utilizing the roadway. It would vastly... I don't know that you could create a policy outside of discretionary acts of Caltrans because it really depends on the particular encampment and the unique nature of those encampments. So going back to the schedule that you posted, you said pre-pandemic. So is there a schedule posted now? Currently, Caltrans has not posted a schedule. So Caltrans has not gone back to its pre-pandemic policy of removing encampments based on a schedule. It's essentially going through, as interim guidelines provide, determining the level of the encampment, levels one and two. Those are essentially removed as expeditiously as possible. If an encampment is a level three or four, then there's kind of a more extended liaison process. But what is the liaison process for ones and twos? It's to reach out to the... How far before the 72-hour notice? It really depends on the encampment. A lot of these encampments, as is indicated, for example, in the declaration of Ms. Chambers, those encampments, Caltrans has actually been working with both the county of Alameda and the city of Berkeley for some time. Those removals did not happen out of the blue. Caltrans had worked for some... I believe, in fact, I think in the record it might have been six to seven months that Caltrans had been discussing with the city and the county the likelihood of potentially getting some of these removals moving forward. How much... What's the length of time before it would have started impeding whatever program exists? If the district court had come in and said, I want two weeks, and issued a TRO, I think that was the... I can't remember what the original TRO was, two, three weeks. Would that have impeded the program? At what point did this start to impede the program that Caltrans has? No, no. I think any time the discretion is removed from Caltrans's hands to determine whether an encampment constitutes a safety threat or risk, that is impeding the Caltrans's program. Your position would be, unless the district court came in and said, hey, you've designated this as a level one or a level two, I think the facts clearly show this is, under your standards, this is a level three or a level four, therefore, it's entitled to greater weight. Absent that, you would say the district court can't exercise its discretion and issue an injunction here? That's correct. But I do have, again, part of the issue with looking at this as a program, or at least entitling a program giving rise to an ADA claim, is that it creates... Well, hold on, counsel. Programs, in the Ninth Circuit, programs, well, and by the statute, programs are covered by the ADA. So that's, I think, the problem that I'm having with your argument is, I think there is a subject to the ADA, but the question is, what is the program? And I think you're not doing yourself any service when you try and say there's no program here. There is a program. I mean, at least under Ninth Circuit law, when the government is acting, that's a program. So I just say that because I think that's led to some confusion in this case throughout. Your Honor, I think if we take... I guess your argument, and I don't mean to... Your argument is apparently going back to the inputs, outputs, and say it's not a program because this isn't for the benefit of the homeless individuals in the encampment. That's one argument. I mean, here's kind of the effect. So if we take the plaintiff's argument that ADA applies, which the court essentially adopted, Caltrans then has to somehow determine whether each individual in the encampment has an ADA disability, right? That creates, feasibly, how would Caltrans be able to actually determine which individuals in the encampment have an ADA disability? It wouldn't. It doesn't have an ability to come into the encampment. This is very different from Caltrans deciding whether to have wheelchair accessible restrooms at rest stops on I-80 or I-15. Those things were architectural barriers, which was the heart of the ADA. And those are things that Caltrans ought to be able to figure out. When you're dealing with mental disabilities, that's not what Caltrans does. Absolutely, Your Honor. And that's our position. And if it's to say that this program is just not subject to ADA, that is another view looking at it. Or you could, again, look at it more of a... What would be the statutory basis? I mean, for saying that this is a program not subject to the ADA. Because the statute says if it's a government program, you're fall within Title II. So that's the disconnect I'm having. But I think if you look at Zimmerman, Zimmerman kind of makes a distinction. And this may not be a great example. Zimmerman says you have to look at inputs and outputs. And an output for a hypothetical parks is providing summer camp, providing basketball courts. An input is hiring employees or purchasing lawnmowers. Here, so if we take a hypothetical court, right, and we take plaintiff's argument to its logical conclusion, somebody could walk into the San Francisco Superior Court down the street, put up a tent in a courtroom, and say, before you can remove me, because this was a subject to ADA, before you can remove me, you have to find me a place I would like to live at, my own personal individualized housing. And if you take plaintiff's argument to its logical conclusion, the court could not remove that tent from the courtroom, even though the court, presumably, the courtroom is... The court has an obligation to have an ADA-accessible courtroom, but it doesn't have an obligation... We'll just have to go back and figure this out. But the ADA does apply, but you can't fundamentally change the program. And I think that's the argument that wasn't totally fleshed out here, which is... And I understand your sensitivity, but I think you've kind of walked back to say, well, the ADA just doesn't apply, doesn't apply, doesn't apply, to, hey, here's how the ADA does apply, but you can't fundamentally change and alter the program, which is to start removing these encampments. And that seems to be where this should rest. So you wouldn't disagree that Caltrans has a program of removing people who are camping on its... For whatever reason, whether it's recreational camping or because they're experiencing homelessness or whatever it is, of removing them. And if you brought in a bus that was not wheelchair accessible, then in that program of removing them, you would be violating the ADA. You'd bring in a wheelchair accessible bus if such a thing were required. But that's a pretty minor accommodation to the ADA. That's correct, Your Honor. And I think what's important actually to note in this case, plaintiffs don't actually allege a desperate treatment or allegation in their complaint. Oh, well, I'll have to go back and look. I hadn't focused on that. The district court ultimately sort of relied on desperate treatment, but you say they didn't even raise it in their complaint. They don't allege desperate treatment or desperate intent. I mean, this is not a McGarry situation where they identify a specific program and indicate how the program constitutes desperate treatment. Those are not the allegations in the complaint. And in fact, there's some other infirmities in the complaint. If you look at the complaint, it doesn't actually identify any specific injury to any individual plaintiffs. The only injury identified in the complaint is to the organizational plaintiff. So, I mean, I think there's a series of issues. But I think the State did argue in the district court that the program had no intent. It essentially morphed the program entirely to start adding new elements, and that the State simply is not in a position to identify whether an individual has a disability beyond if it's in a sidewalk, and a sidewalk has to be accessible. I'm not sure that I totally agree with that argument. Because clearly, at some point, you've got to start removing these individuals. And to Judge Bybee's point, if somebody says, no, I'm not leaving, and you try and force them to leave in a way that doesn't accommodate their disability. Now, that's not what we have here, because you've got mental disabilities. And I understand that there's a problem. But still, you have to remove them in a way that would be consistent with their disabilities. That doesn't mean that they have to be given seven months to find something else. But it does mean you've got to accommodate them. You can't, you can't, you've got to accommodate them in a way that would be consistent with the program. Right. But I think what, if I understand what the court's saying, is accommodate them by allowing them to actually be able to leave the property, not accommodate them by allowing them to stay an indefinite period of time until they find individualized housing. At least from my perspective, that's what I'm struggling with. So, okay. Are there more questions? Thank you, counsel. Thank you to both counsel for helping us on this case. The case is now
judges: BYBEE, NELSON, Bolton